IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-00857-MSK-CBS

PATRICIA RODRIGUEZ,

      Plaintiff,

v.

WET INK, LLC d/b/a ALPHAGRAPHICS a/k/a WET INK, CORPORATION,

      Defendant.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on a Motion for Summary Judgment **(#70)** filed by Defendant Wet Ink, LLC d/b/a AlphaGraphics a/k/a Wet Ink, Corporation's ("Wet Ink"), to which Plaintiff Patricia Rodriguez responded **(#76)**, and Wet Ink replied **(#80)**.  Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

### I.   Issue Presented

In this action, Ms. Rodriguez asserts claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for hostile work environment sex discrimination, disparate treatment sex discrimination, national origin/ancestry discrimination, and retaliation.  Wet Ink moves for summary judgment on the grounds that Ms. Rodriguez's evidence is insufficient to establish all of the elements of her claims and that it is entitled to judgment as a matter of law on its affirmative defense.

### II.   Material Facts

The Court has reviewed all of the parties' submissions.  For purposes of this Motion only, the Court construes all disputed facts most favorably to Ms. Rodriguez.

Ms. Rodriguez is Hispanic.  She began working for Wet Ink, doing business as AlphaGraphics on April 18, 2005.  Her primary job duty was delivering print jobs but she also did some work in the bindery. She had one other coworker in the bindery, Steve Carl, who also did some delivery work.  Her direct supervisor was Tom Meltz.  Mr. Meltz and Mr. Carl are Caucasian.

According to all accounts, Ms. Rodriguez's first few months at AlphaGraphics were without incident and she got along with Mr. Meltz.  However, beginning around October 2005 Mr. Meltz appeared less friendly with her.  She recalls that he became more short and aloof with her, but not other employees.  He did not greet her in the morning, "barked" orders and would point out her mistakes in front of other employees.  He also blamed her for mistakes that were not hers, and supervised her work more closely than that of other employees.  Ms. Rodriguez was informed by her co-workers that sometimes when she asked Mr. Meltz a question about a job, he would make faces behind her back.

Ms. Rodriguez recalls that Mr. Meltz was also short and rude with another female employee, Dallas Shelton, and that male employees were allowed to take longer breaks and did not have to fill out "redo forms," paperwork showing that an error had been made and accounting for the inventory used.

A.   **Specific Incidents of Alleged Harassment/Discrimination**

Ms. Rodriguez identifies the following specific incidents of harassment or discrimination by Mr. Meltz.

On February 2, 2006, a print job of business cards was completed for delivery at 1:00 p.m. Normally a job board posted the job and the person to deliver it, but on this occasion it did not show that the delivery was needed.  At 4:50 p.m., Mr. Meltz asked why the delivery had not gone out; Ms. Rodriguez told him something like "Well, nobody told me or nobody changed the [job board].  How was I supposed to know about it?"  Mr. Meltz then instructed Ms. Rodriguez to make the delivery. When Ms. Rodriguez protested because it was close to the end of her shift, he said something like "well, you'd better hurry up then."  She believes that Mr. Meltz delayed informing her of the need to do the delivery in order to make her job harder to do.  She also believes that Mr. Meltz would not have told Mr. Carl, the other person responsible for deliveries, do a last minute delivery, or in the manner that he told Ms. Rodriguez to do so.

A second incident is described in a letter from Ms. Rodriguez to the company.

> On Monday 02-06-06, he (Tom Melts) was talking with 'Chip' [a coworker] @ 10:00 a.m.  I had a question about a job that I was working on.  I approached them and stood by the cutter machine giving myself enough space between Tom and myself so not to invade his conversation, yet within his sight so that he would notice that I was waiting for him.  He looked right at me in acknowledgment then continued his conversation with Chip.  As I was waiting approx. 5 minutes and suddenly Chuck [another coworker] arrived with a question for Tom.  As Tom Melts finished his conversation with Chip he then walks past me towards Chuck and asked 'What do you need Chuck?'  At that time Chuck looks at me and back to Tom and says to Tom 'Patty was here first.'  I also began to complain to Tom for ignoring me with such rude overtones.  As Tom relized [sic] he's on the spot, he sarcastically says to me 'What do <u>you</u> need?!'  I felt disrespected, belittled and very embarrased [sic].  To be honest, I believe thats how Tom wanted me to feel; he seen the opportunity to degrade me + he did!

**#70-5.**

A third incident occurred on February 7, 2006.  Mr. Meltz told Ms. Rodriguez to pick up

3

an order (a single box) from Paper Plus. When she arrived, she discovered it was a much larger order.  The personnel at Paper Plus told her the order could have been delivered for free and that they had expected to do so.  The personnel at Paper Plus assisted her in loading her car and when she arrived back at AlphaGraphics Mr. Carl helped her to unload the order.  When Ms. Rodriguez confronted Mr. Meltz about him sending her to pick up this order when it could have been delivered,  he responded "Oh well, you were already on your way there."  Ms. Rodriguez felt this was degrading and belittling to her.

Another incident occurred on February 13, 2006. Mr. Meltz called Ms. Rodriguez on her cell phone while he knew she was on her lunch break.  Ms. Rodriguez believes that he would not do this to a male or a Caucasian employee.

Two days later, on February 15, 2006, Mr. Meltz greeted Ms. Rodriguez' co-workers with  "good morning" but said nothing to her.  She greeted him, but he did not initially respond. After she said "good morning" again, he gave her a blank look and sarcastically said "Oh, good morning."

Another incident involved signs printed for King Soopers.  Ms. Rodriguez was not working on the job but when an error was discovered, but Mr. Meltz yelled at her for doing it incorrectly.  He told her to fix the problem.  Ms. Rodriguez argued and yelled back at him since it was not her mistake.  Then she walked away.  She does not remember who ultimately fixed the work.

In April 2006, she and Mr. Meltz argued again about a job mistake that he wrongfully blamed on her.  When the argument became heated, he threatened to send her home unless she stopped arguing.  Mr. Meltz ultimately directed her to leave, but his order was countermanded by

4

Dave Mooney, Mr. Meltz's supervisor.

Ms. Rodriguez recalls that on several occasions deliveries were left out without notice being placed on the delivery board at the end of the day.  Although she figured out that the deliveries needed to be made the next day and did them, she believes that Mr. Meltz did this "just to harass me, just to get under my skin."  Pl.'s Dep., **#81**, at 295.

At some point, Ms. Rodriguez told Mr. Meltz that she was interested in being trained to work the front counter position but his response was "You're doing fine where you are."  She concedes that Mr. Meltz was not responsible for training or hiring for the front counter position, and that she never spoke to either of the owners of AlphaGraphics about changing her job.

### B.      Mr. Meltz's Comments

The record reveals no racial or ethnic comments made by Mr. Meltz.  However, Ms Rodriguez complains of several disparaging comments by Mr. Meltz relating to women.  The first occurred sometime around May 24 or May 25, 2006.  Ms. Rodriguez, Mr. Meltz, Mr. Carl and another male employee were in the office.  Ms. Rodriguez was putting away supplies and according to her, the other employees were only hanging around.  Mr. Meltz instructed her to do some filing.  She said that Mr. Carl should do it, but Mr. Meltz replied that "women are better at filing" and that Mr. Carl would just mess it up.

Another incident occurred in summer 2006.  Ms. Rodriguez observed Mr. Meltz watch a woman customer leave the store.  After the customer left, he used binoculars to watch the woman, and stated something like, "I wouldn't mind gettin' at that."  In addition, at some unspecified time, Mr. Meltz was taking a friend to a strip club at lunch for the friend's birthday and said something like, "All women are good for is pole dancing and taking off their clothes."

5

C.      **Company Policies and Company action in response to Ms. Rodriguez's**

**Complaints**

Ms. Rodriguez received the company handbook that contains a non-discrimination policy

and procedures for complaining about harassment and discrimination.  "Harassment" is

described in detail and a separate section on "Sexual Harassment" is provided.  The manual

provides examples of prohibited conduct with respect to sexual harassment, and also explains

that disparate treatment on the basis of gender is prohibited.  The manual provides a form for

making complaints about sexual harassment and advises that complaints should be sent to the

President of the company or to the company attorney, whose name and contact information is

provided. Ms. Rodriguez did not specifically comply with these procedures, but there is no

dispute that the President of the company was notified of her complaints.

In February 2006, she wrote to Dave Mooney, Mr. Meltz's supervisor and a part-owner

of the business.  The letter stated, "This letter of complaint is to inform my employer Dave

Mooney, part owner of Alpha Graphics Print Comp, of the prejudice + discriminating treatment

that my immediate supervisor Tom Melts has, and continues to exercise against me on a regular

basis."  **#70-5**.  The letter recounted the February 6, 2006, February 7, 2006 and the February 15,

2006 incidents, as well as the information Ms. Rodriguez had received that Mr. Meltz made

faces at her behind her back.  Ms. Rodriguez contended these episodes showed Mr. Meltz's

"derogatory statements and prejudice[d] behavior" towards her.  The letter concluded with

several observations, including that Mr. Meltz "is a case for the State Civil Rights Dept. just

waiting to happen" and that he was a "bigot."  Ms. Rodriguez stated that she wished to continue

to working at AlphaGraphics but that she would "fight for my rights of equal treatment."  She

6

requested that AlphaGraphics "look into all this and to resolve this matter" and stated her preferred result was "me no longer having to answer to [Mr. Meltz] or being under his supervision."

Mr. Mooney notified the President of Wet Ink, Edward Rothschild.  Mr. Rothschild met Mr. Mooney and Mr. Meltz, and Mr. Meltz disputed Ms. Rodriguez's account of events.  Mr. Mooney conducted an investigation but the record does not reveal the scope or result of the investigation.  It appears that Mr. Meltz just promised to try to get along better with Ms. Rodriguez.  In June 2006, Ms. Rodriguez received a raise.

Ms. Rodriguez submitted another letter of complaint to Mr. Mooney dated June 18, 2006, in which she stated that Mr. Meltz had rudely yelled at her and belittled her and only acknowledged her when he was in a good mood.  **#70-6**.  "His attitude towards me changes when I make a mistake or if I say how I think it happened."  *Id*.  She stated that Mr. Meltz talked to the other employees but was "snotty" to her and let other employees get away with things but "keeps a hawk eye on me."  She stated that other employees were allowed to just stand around while Mr. Meltz threatened to send her home for "not doing anything."

Perhaps in response to this letter, Mr. Mooney took her and Mr. Meltz out for lunch in June 2006 and encouraged them to get along.  There is no evidence of any other investigation or action taken after this letter.

### D.     Other complaints and comparators

Two other female employees worked at AlphaGraphics during the relevant time period, Dallas Shelton and Cindy Clark, both of whom are Caucasian.  Ms. Rodriguez observed that Mr. Meltz also treated Ms. Shelton poorly.  In February 2006, Ms. Shelton also submitted a letter of

complaint[1] regarding Mr. Meltz's treatment of her.  **#70-6**.  Ms. Shelton, like Ms. Rodriguez,

complained of Mr. Meltz's "animosity," "moodiness," "arrogance," and "indifference."  She

noted that he consistently interacted with other store employees but not her.  She noted that he

seemed to greatly assist and cover for another (male) employee who was Mr. Meltz's friend, but

was not willing to provide the same attention and assistance to her.  Ms. Shelton complained in

particular about Mr. Meltz's treatment of Ms. Rodriguez.  She stated that Mr. Meltz had made

deprecating comments about Ms. Rodriguez and poked fun at her behind her back.  She believed

that Mr. Meltz should be more supportive of Ms. Rodriguez and spoke highly of Ms.

Rodriguez's job skills, although she did note that Ms. Rodriguez had "mood swings."  There is

no evidence that Ms. Shelton's complaint was investigated or addressed in any other way.

Ms. Clark worked at the front desk.  She and Mr. Meltz apparently had an amicable

relationship although a coworker stated in an affidavit that sometimes Ms. Clark bore the brunt

of Mr. Meltz's "unprovoked anger."

### E.    Warning and Termination

The circumstances under which Ms. Rodriguez left the employ of Wet Ink are somewhat

unusual.  On August 28, 2006,  Ms. Rodriguez states she arrived at work and was told to deliver

a job that was supposed to have been delivered the Friday before.  She explained that Mr. Carl

was supposed to do that delivery and said that the box was too heavy for her and needed to be

divided into two.  She nonetheless made the delivery.  When she returned, she asserts that Mr.

Meltz began to "harass" her about another delivery job.  At that time, Ms. Rodriguez gave Wet

---

[1]Ms. Rodriguez offers this letter not for the truth of the statements contained therein but rather as evidence that Wet Ink had notice of the problems at the workplace.

Ink notice that she would be resigning her employment, effective in two weeks. Her written notice states that she is leaving "because of how Tom Melts has been treating me at work."

Wet Ink contends that, prior to that date, Mr. Mooney had been preparing[2] a written warning letter to be delivered to Ms. Rodriguez, advising her of various alleged defects in her performance and advising her that, unless this behavior ceased, "we have no other choice than to terminate your employment."  Notwithstanding the fact that Ms. Rodriguez had already tendered her resignation, Wet Ink nevertheless delivered the warning letter to her.

Wet Ink contents that it then invoked a company policy in which employees who have given two weeks' notice of their resignation are instead offered "severance pay" reflecting two weeks' wages and are allowed to cease employment immediately.  Wet Ink explains that employees who have given notice are generally unproductive and unfocused during that two week period.  Although there is evidence in the record to suggest that this is Wet Ink's general policy, there is also evidence that indicates that the policy was not followed in Ms. Rodriguez's case.  Mr. Mooney and Mr. Rothschild, officials of Wet Ink, both testified in their depositions that they met with Ms. Rodriguez about her notice of resignation on the same day that she tendered it. Mr. Mooney testified that he has no particular recollection of the meeting, and believes that Mr. Rothschild "would have taken over the conversation" on that issue.  Mr. Rothschild also professed to have no independent recollection of the events of the meeting, and deferred to representations Wet Ink made in a letter to the state in response to Ms. Rodriguez's

---

[2]Ms. Rodriguez expresses doubt that the letter had been prepared previously, and states that there was sufficient time between the tender of her resignation and the delivery of the warning letter for the letter to have been created from scratch in response to her resignation notice.  The analysis herein is unaffected by the question of when the letter was initially drafted.

application for unemployment benefits.  That letter suggests that Ms. Rodriguez was offered a

check for her final two weeks' wages, along with what is described as being either a "waiver" or

a "release" for her to sign.  The record before this Court does not reveal anything further about

this meeting, but the Court assumes from Ms. Rodriguez's contentions herein that she refused to

sign the proffered waiver or release, and thus, Wet Ink refused to issue her the check.  As a

consequence, Ms. Rodriguez's employment was effectively terminated immediately by Wet Ink.

After exhausting her administrative remedies, Ms. Rodriguez initiated this lawsuit.  The

Complaint (# 1) nominally contains only two claims, one asserting sex discrimination and one

asserting national origin discrimination, each in violation of Title VII.  However, each "claim"

contains several subclaims or discrete and independent theories of liability, and therefore the

claims are more accurately described as follows: (1) disparate treatment based on sex, (2)

disparate treatment based on national origin, (3) creation of a hostile working environment on

the basis of sex, (4) creation of a hostile working environment on the basis of national origin,

and (5) retaliation.

### III.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

10

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

When the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

11

**V.  Analysis**

Wet Ink moves for summary judgment on all claims on the grounds that (1) Ms. Rodriguez's evidence is insufficient to establish all the elements of her claims; (2) it had legitimate non-discriminatory reasons for its actions; and (3) as to the hostile work environment claim, it is relieved from liability because the undisputed facts show that it took prompt remedial action, an affirmative defense.  Ms. Rodriguez has the burden of proof as to her claims of discrimination and Wet Ink has the burden of proof as to its affirmative defense.

However, it appears that Wet Ink did not recognize the "subclaims" contained within Ms. Rodriguez's Complaint, and as a result it failed to address all of the theories upon which Ms. Rodriguez asserts liability.  For example, Wet Ink did not address Ms. Rodriguez's claim of retaliation nor all of the adverse actions upon which she bases her claims of discrimination. Nonetheless, the Court will analyze whether Mr. Rodriguez's evidence is sufficient to carry her burden as to this claim and these elements.

**A.      Sex Discrimination - Disparate Treatment**

Title VII makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).  Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a *prima facie* case of discrimination.  *Garrett v. Hewlett–Packard Co.*,

305 F.3d 1210, 1216 (10th Cir.2002).  The burden then shifts to the defendant to produce a

legitimate, non-discriminatory reason for the adverse employment action.  *Garrett*, 305 F.3d at

1216.  If the defendant does so, the burden then shifts back to the plaintiff to show that the

plaintiff's protected status was a determinative factor in the employment decision or that the

employer's explanation is pretext.  *Id.*

      To set forth a *prima facie* case of discrimination based on disparate treatment, a plaintiff

must present evidence that (1) she belongs to a protected class; (2) she suffered an adverse

employment action; and (3) the adverse action occurred under circumstances giving rise to an

inference of discrimination.[3]  *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).  Wet Ink

moves for summary judgment on Ms. Rodriguez's disparate treatment sex discrimination claim

on the grounds that she cannot prove several essential elements of *prima facie* case: (1) that she

suffered an adverse employment action; and (2) that the circumstances of each alleged adverse

action gives rise to an inference of discrimination.  Wet Ink also contends that it had a legitimate

nondiscriminatory reason for the alleged action that Plaintiff cannot show is pretextual.

    **1.**    **Adverse Action**

      Adverse actions, for the purposes of a discrimination claim, are limited to "acts that

---

[3]Wet Ink contends that a plaintiff must demonstrate as part of the *prima facie* case that he or she was performing the job satisfactorily, citing an unpublished case from the United States District Court for the Western District of Oklahoma.  This formulation adds an additional element not required under Tenth Circuit case law.  Although sometimes the Tenth Circuit includes as an element of the *prima facie* case that the employee show that he or she was "qualified for the position at issue," *see, e.g., Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998), Ms. Rodriguez's evidence is sufficient to carry her *prima facie* burden as to this element.  Ms. Rodriguez was hired in the position, performed without incident for at least six months, and was performing well enough to receive a raise in June 2006.  This is sufficient to establish that she was qualified for the position.

constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006) (citation omitted).  Nonetheless, a court must take a "case-by-case approach, examining the unique factors relevant to the situation at hand" in determining whether an adverse action occurred.  *Id*.

Ms. Rodriguez's brief identifies four adverse actions that she alleges were taken against her on account of her sex: (1) failing to protect her from a hostile work environment; (2) subjecting her to less favorable terms and conditions of employment, including being given less favorable job assignments; (3) issuing an unfounded written warning to her; and (4) terminating her employment (either a constructive discharge or termination of the last two weeks of her employment after she gave her notice).

The "adverse action" of a hostile work environment issue is a separate claim, discussed below.  The remaining alleged adverse actions are addressed here.

### a.    Less Favorable Terms and Conditions of Employment

Ms. Rodriguez makes a perfunctory argument that she was subjected to an adverse employment action insofar as she "was subjected to less favorable terms and conditions of employment including, but not limited to, allowing her to be denied favorable work assignments, allowing allegations of performance issues to be trumped up against her, and allowing her to be treated with hostility and disrespect."  Beyond citing to a paragraph in the Complaint, Ms. Rodriguez does not elaborate upon this single-sentence argument.

The Court declines Mr. Rodriguez's apparent invitation to canvass the record, without

any further assistance, to ascertain situations in which she was "denied favorable work assignments."  Ms. Rodriguez might be referring to her request to Mr. Meltz to train for assignment to the front counter position, to the fact that she was sent off on late or burdensome delivery tasks, that she was asked to perform filing work, or some other situation.  Without more specificity as to the particular "favorable" assignments she was denied (and the circumstances under which she was denied them), the Court declines to attempt to *sua sponte* fashion a claim for her.

As to her contention that having "allegations of performance issues . . . trumped up against her," disciplinary actions can constitute an adverse employment action, but only where such discipline "effects a significant change in the plaintiff's employment status."  *Haynes*, 456 F.3d at 1224.  Ms. Rodriguez specifically alleges that formal discipline against her – the written warning – constitutes a separate adverse action and the Court addresses that issue below.  To the extent that Ms. Rodriguez contends that ordinary, day-to-day criticism of her work by Mr. Meltz constitutes a distinct adverse employment action, she has failed to demonstrate how such criticism effected a significant change in her employment status, and thus, these ordinary criticisms do not constitute an adverse action.

Finally, to the extent that Ms. Rodriguez contends that she was "treated with hostility and disrespect, that contention is simply a rephrasing of her hostile work environment claim, which the Court addresses below.  Thus, the Court finds that Ms. Rodriguez's argument that she was "subjected to less favorable terms and conditions of employment" does not adequately establish a particular adverse action.

       **b.**      **Warning Letter**

"A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status." *Haynes*, 456 F.3d at 1224 (emphasis in original). Here, the warning letter recited various criticisms of Mr. Rodriguez's work and warned her that she would be terminated if her performance did not improve, but the letter itself did not purport to demote or suspend her, take away or add job responsibilities, change her pay, or otherwise pose any material change in her employment status. It merely served as a warning that she faced consequences if her performance did not improve. Under these circumstances, the letter did not constitute an adverse employment action.[4] *See Anderson v. Clovis Mun. Schools*, 265 F.3d 699, 705 (10th Cir. 2008) (unpublished).

### c.   Termination of Employment

Although Ms. Rodriguez attempted to resign from her position, she contends that the termination of her employment was involuntary, and therefore an adverse action, because (a) she was immediately let go after she submitted her two-week notice; and (b) she was constructively discharged.

### i.   Immediate Termination after Two-week Notice

Wet Ink argues that its decision to not require Ms. Rodriguez to work her final two weeks does not amount to a termination of her employment and therefore is not an adverse action. However, there is no dispute that Ms. Rodriguez tendered her resignation to take effect upon two weeks' notice and she was prepared to work the remaining two weeks of her employment.

---

[4]In her response brief, Ms. Rodriguez argues that the warning letter stayed in Ms. Rodriguez's employment file, "potentially affecting future employment opportunities." There is no evidence that the warning letter has affected Ms. Rodriguez in any tangible manner or that any future employer has access to it.

Nevertheless, Wet Ink terminated that remaining period of her employment, effectively depriving her of two weeks' wages. Indisputably, termination of employment constitutes an adverse action. *Compare Wynn v. Paragon Systems, Inc.*, 301 F.Supp.2d 1343, 1354 (S.D.Ga. 2004) (finding no adverse action where employer immediately terminated employee who gave two-weeks' notice, but then paid her "severance pay" equivalent to that period's wages). There can be little dispute that Wet Ink did indeed prematurely "terminate" Ms. Rodriguez's employment, even if the parties both expected that such employment would otherwise have come to a natural end two weeks later.

Admittedly, the damages available to Ms. Rodriguez based on a two-week-premature cessation of her employment will be minimal, entitling her only to economic damages amounting to two weeks' wages (and, arguably, non-economic damages arising from the fact that she was ushered out of a position she was planning on leaving soon anyway).[5] But that is not a matter that affects the viability of the substantive claim that her premature termination constituted an adverse employment action. Therefore, the termination of the last two weeks of Ms. Rodriguez's employment amounts to an adverse action.

### ii.    Constructive Discharge

Alternatively, Ms. Rodriguez contends that her resignation was involuntary and amounted to a constructive discharge. An employee who resigns from a position may

---

[5]Wet Ink's reply posits that Ms. Rodriguez would pursue a termination claim premised solely upon the two-weeks' premature termination in an attempt to recover attorney's fees. There is little need for such concern. The Supreme Court has made clear that the amount of fees awarded to a prevailing party should be commensurate with the degree of success obtained. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). If Ms. Rodriguez proceeds solely on the relatively low-value nominal termination claim, any claim she would make for a resultant fee award would be evaluated accordingly.

nonetheless demonstrate that the resignation was an involuntary termination of employment, and therefore an adverse action, on the theory that the employee was constructively discharged. "Constructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable.  That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign." *Yearous v. Niobrara County Memorial Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997).  To determine whether an employee was constructively discharged, the court applies a reasonable person test, not one based on the employee's "subjective views of the situation," or his "employer's subjective intent."  *Potts v. Davis County*, 551 F.3d 1188 (10th Cir. 2009) (citation omitted).  The employee must show that he or she had "no other choice but to quit," not merely that his working conditions "were difficult or unpleasant" due to disagreements with his supervisors.  *Id*. (citation omitted); *see also Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004), *quoting Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) ("It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world").   The plaintiff's burden in a constructive discharge case is "substantial" and requires a greater showing than that needed to establish a "tangible employment action" or "adverse employment action."  *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir. 2007).

Construing the evidence in the light most favorable to her, Ms. Rodriguez has shown that Mr. Meltz sometimes did not greet her, was unfriendly and "rude" in his tone of voice, on some occasions blamed her for mistakes of others or asked her to fix mistakes others had made, monitored her closely and criticized her in front of others, and sometimes raised his voice.  The

specific incidents she describes as "harassment" generally involve Mr. Meltz having her do tasks within her job responsibility but under circumstances that she felt were unfair or somewhat burdensome.  At some point she was told that he had made faces behind her back but there is no showing of whether this continued after she complained.  She identifies occasional sexist comments by Mr. Meltz, but does not point to sexist or abusive language he directed towards her specifically.

In sum, she primarily contends Mr. Meltz was rude, abrupt, and favored other employees over her.  Certainly, Ms. Rodriguez may have felt that this work situation with Mr. Meltz was unpleasant, but Title VII "does not establish a general civility code for the workplace," and employees may be subjected to 'run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces" without that conduct arising to the point of unlawfulness sufficient to warrant a finding of constructive discharge.  *See e.g. Morris v. City of Colorado Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012).  Here, the most troubling aspects of Ms. Rodriguez's allegations against Mr. Meltz amount to little more than allegations of boorish comments or the routine social slights that occur in workplaces where personalities clash.  The Court cannot criticize Ms. Rodriguez for feeling that resignation was the best choice for her, but it cannot go so far as to say that a reasonable employee in the same circumstances would have felt that resignation was the <u>only</u> option available.  Accordingly, the Court finds that Ms. Rodriguez has not demonstrated facts sufficient to show that she was constructively discharged.

Thus, the Court finds that Ms. Rodriguez has alleged only one colorable adverse employment action: the decision by Wet Ink to terminate her immediately upon her tender of two weeks' notice, rather than allowing her to complete that two-week period.  Although the Court

19

has some doubt as to whether Ms. Rodriguez would continue to press her sex discrimination claim when the potential range of relief is so narrow, the Court will nevertheless proceed to ascertain whether a colorable sex discrimination claim based on this single adverse action can be asserted.

### 2.    Circumstances Giving Rise to An Inference of Discrimination

Wet Ink contends that Ms. Rodriguez's disparate treatment sex discrimination claim fail because her evidence is insufficient to show that she was treated differently from similarly situated employees outside of her protected class or other circumstances that give rise to an inference that the adverse treatment was because of her sex.

An inference of discrimination can arise from a number of sources, including evidence of more favorable treatment afforded similarly-situated employees outside the protected class, conduct in contravention of established policies of the employer, or other evidence suggesting that the adverse action was taken for reason of sex discrimination. *See Hysten v. Burlington Norther & Santa Fe RR Co.*, 296 F.3d 1177, 1182-83 (10th Cir. 2002).  At a minimum, Ms. Rodriguez has shown that Wet Ink that it did not follow its customary policy of offering two weeks' "severance" pay to employees tendering notice.  At best, the evidence indicates that Wet Ink offered her such a payment, but only if she also agreed to waive or release unspecified legal rights (most likely, the very claims she now asserts here).[6]  Moreover, there is general evidence deriving from Mr. Metlz's sexist comments that permit an inference that he harbors discriminatory animus towards Ms. Rodriguez, and the record does not clearly indicate that Mr.

---

[6]Wet Ink's evidence describing the general policy relating to severance pay makes no mention of requiring the employee to agree to a waiver or release in order to accept its offer.

Meltz was <u>un</u>involved with the decision to immediately terminate her.  Under these

circumstances, the Court finds that Ms. Rodriguez has carried her minimal burden of

establishing a *prima facie* case of discrimination solely with regard to the claim that Wet Ink's

decision to terminate her employment immediately after she tendered her notice was the result of

sex discrimination.

### 3.    Legitimate Non-discriminatory Reason for Action and pretext

As noted above, after a plaintiff establishes a *prima facie* case of discrimination, the

burden shifts to the employer to articulate a legitimate non-discriminatory reason for the alleged

adverse action. With respect to the immediate termination, Wet Ink provides evidence that it

summarily dismissed Ms. Rodriguez because it did not want to have an unmotivated employee

on the job, or one who was distracted looking for other work.  It also claims to have a policy of

not having employees continue to work after giving their notice.

The burden then shifts to Ms. Rodriguez to show that Wet Ink's proffered reason is false

and that sex discrimination is the true reason.  As noted above, there is evidence that Wet Ink

deviated from any general policy of granting severance pay to employees who have tendered

notice, either insofar as Wet Ink apparently required Ms. Rodriguez to supply a release of claims

in order to obtain her severance pay – a requirement that Wet Ink does not claim to have

extracted from any other employee – or insofar as the evidence is unclear whether <u>any</u> offer was

actually made.  The fact that Wet Ink cannot explain why it apparently deviated from its policy,

coupled with the residual evidence of sex discrimination by Mr. Meltz, is sufficient to establish a

genuine dispute of fact as to whether Wet Ink's proffered reason for immediately terminating

Ms. Rodriguez is pretextual.  Accordingly, summary judgment is not appropriate on the claim of

sex discrimination.

### B.      National Origin Discrimination - Disparate Treatment

Wet Ink moves for summary judgment on the national origin discrimination claims on essentially the same grounds – that Ms. Rodriguez cannot prove two essential elements of her *prima facie* case (an adverse action or circumstances giving rise to an inference of discrimination), and, ultimately, cannot show that the non-discriminatory reasons offered for Wet Ink's actions are a pretext for national origin discrimination.

### 1.      Adverse Action

Ms. Rodriguez relies on the same adverse actions in support of her national origin discrimination claim as she does for her sex discrimination claim.  Therefore, for the reasons discussed above, Ms. Rodriguez's evidence is sufficient to carry her *prima facie* burden to show that the immediate termination of her employment, but not on any other alleged actions.

### 2.      Circumstances Giving Rise to An Inference of Discrimination

Wet Ink also contends that Ms. Rodriguez's disparate treatment national origin discrimination claim fails because her evidence is insufficient to show that she was treated differently from similarly situated employees outside of her protected class or other circumstances that give rise to an inference that the adverse treatment was because of her national origin.

Unlike the sex discrimination claim, Ms. Rodriguez's evidence does not show that Mr. Meltz's treatment of her, nor any other decision made in the course of her employment, had anything to do with her Hispanic heritage.  Although she provides generic assertions that Mr. Meltz treated her male Caucasian coworkers more politely, his poor treatment also extended to

22

Ms. Shelton and sometimes to Ms. Clark, both of whom are Caucasian. Ms. Rodriguez offers no evidence of comments by Mr. Meltz relating to national origin/ancestry or any other evidence suggestive of discriminatory animus based on national origin.[7] When asked her in deposition why she believed Mr. Meltz was discriminating against her based on her national origin, she stated, "I just felt that because I was Hispanic that he just degraded me a little bit. He just didn't treat me like I was a person." Pl.'s Dep., **#81**, at 234. Ms. Rodriguez's feeling is insufficient to carry her *prima facie* burden as to this element.

Therefore, the motion is granted as to Ms. Rodriguez's national origin discrimination claim.

### C. Hostile Work Environment

A claim of discrimination may be based on harassment resulting in a hostile work environment. To establish that a hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (citations omitted).

To establish the fourth element of the claim, a plaintiff must show that the environment was both objectively and subjectively hostile or abusive. *Morris v. City of Colorado Springs,*

---

[7]The only evidence she offers in this regard is a single incident in which Mr. Meltz said good morning to Ms. Clark and another male Caucasian employee but not to Ms. Rodriguez. However, given her other evidence that sometimes Ms. Clark bore the brunt of Mr. Meltz's "unprovoked anger," this incident is not sufficient to carry Ms. Rodriguez's burden as to this element.

666 F.3d 654, 664 (10th Cir. 2012) (citations omitted).  Thus, the Court assesses "the objective

severity of the harassment from the perspective of a reasonable person in the plaintiff's position,

considering all the circumstances," *Renner*, 475 F.3d at 1187.  Several factors have been

identified to guide this analysis, including the frequency of the conduct, its severity, whether it is

physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably

interferes with an employee's work performance.  *Chavez v. New Mexico*, 397 F.3d 826, 832–33

(10th Cir. 2005) (citation omitted).

     The Court understands Wet Ink to challenge only one element of Ms. Rodriguez's hostile

work environment claim – that she was subjected to harassment because of her sex.  In addition,

it asserts an affirmative defense of prompt remedial action.

     **1.**      **Element of Plaintiff's Claim - Harassment Because of Sex**

     Wet Ink contends that although Ms. Rodriguez asserts a variety of actions by Mr. Meltz

that were rude, demeaning, or insulting, only one of those actions was unmistakably based on

Ms. Rodriguez's sex: his requirement that she perform certain filing tasks because "women do

better filing than men."  With regard to the remaining instances of conduct by Mr. Meltz towards

her, Wet Ink argues that Mr. Meltz was "friendly" and "got along with" every other employee,

male and female, except her.

     The element that acts of hostile treatment be "based on sex" requires that the conduct be

based on discriminatory animus against the employee's sex, not that the conduct relate to sexual

activity or have sexual connotations.  *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1263

910th Cir. 2005).  Although claims are often premised upon conduct connected to sexual activity

or sexual desire, a hostile work environment claim may also arise in circumstances where the

harasser engages in conduct "in such sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace," or where "the harasser treats men and women differently in the workplace." *Id.* at 1264. At the same time, the Court must be mindful of the fact that "Title VII is not a general civility code for the American workplace." *Harsco,* 475 F.3d at 1186.

The Court has some difficulty with characterizing the totality of Mr. Meltz's conduct towards Ms. Rodriguez as being "based on sex." Undoubtedly, the two participants are of different sexes, but no court has ever held that this alone satisfies the "based on sex" element. Rather, the Court must look to the particulars of the conduct perpetrated against Ms. Rodriguez by Mr. Meltz, and in this respect, there is relatively little evidence that most of that conduct was necessarily based on the fact that Ms. Rodriguez is female. The "filing" comment is certainly sex-based, and the Court also notes that Mr. Meltz's conduct in spying on a female customer with binoculars and making a lewd comment about her, as well as Mr. Meltz's statement that he was going to a strip club and that "all women are good for is . . . taking off their clothes" (all statements made in Ms. Rodriguez's presence) are indisputably offensive comments that are based on sex.

The remainder of Ms. Rodriguez's allegations concerning Mr. Meltz do not bear any clearly evident connection to sex bias. She contends that Mr. Meltz was abrupt and rude to her, but there is little in the record to connect this behavior to Ms. Rodriguez's sex, as opposed to, say, Mr. Meltz disliking Ms. Rodriguez's personality or him being more comfortable with employees he has known longer, among other benign explanations. But where some of a harasser's conduct can be categorized as being overtly sex-based, courts consider it more likely

that hostile conduct of uncertain origin might very well arise from the same sex-based hostility. *Semsroth v. City of Wichita,* 304 Fed.Appx. 707, 725 (10th Cir. 2008) (unpublished).  Moreover, Ms. Rodriguez has also come forward with evidence that Mr. Meltz also treated Ms. Shelton[8] with similar disdain, even though he had an agreeable relationship with Ms. Clark and apparently with all male employees.  As cases like *Dick* explain, evidence that a harasser harbors "general hostility" to the opposite sex in the workplace or "treats men and women differently" can demonstrate that the harasser's conduct is "based on sex."  The fact that Mr. Meltz was friendly with Ms. Clark does not defeat such a showing here; there is no requirement that a harasser direct offensive conduct towards <u>every</u> female in a workplace before a hostile environment claim may lie.

Based on Mr. Meltz's overtly sex-biased comments, plus the inferences that can be drawn therefrom regarding his generally rude treatment of Ms. Rodriguez, plus evidence of similar treatment directed at Ms. Shelton, the Court finds sufficient evidence that Mr. Meltz's engaged in sufficiently pervasive (if not particularly severe) conduct that was "based on sex" to permit the hostile environment claim to proceed.  Admittedly, this is a relatively weak claim, surviving summary judgment only by virtue of relatively generous inferences in Ms. Rodriguez's

---

[8]The Court understands that Wet Ink contends that Ms. Shelton "has not been located by either party" and is not expected to appear at trial, and thus, that Wet Ink believes that no evidence relating to Ms. Shelton will ultimately be admissible.  The Court finds that the fact of Ms. Shelton's absence is addressed only in one line in Wet Ink's reply brief, with no further explanation of the efforts that have been made to locate Ms. Shelton or to otherwise shed any light on her absence.  The Court is not inclined to make any evidentiary rulings on such a scant record, and thus, for purposes of this motion only, assumes that Ms. Rodriguez will be able to present evidence concerning Ms. Shelton at trial.  If, at the time of trial, Ms. Rodriguez is not able to establish that evidence about Ms. Shelton is admissible, that may affect Ms. Rodriguez's ability to survive a motion pursuant to Fed. R. Civ. P. 50 with regard to her harassment claim.

favor, and the Court expresses no opinion as to whether the claim would also be likely to survive

a Rule 50 motion at trial, particularly if the evidence relating to Ms. Shelton is excluded.

> **2.      Wet Ink's Affirmative Defense**

Wet Ink argues that, even if Mr. Meltz may have created a hostile work environment for

Ms. Rodriguez, Wet Ink is nevertheless entitled to invoke the affirmative defense that it

exercised reasonable care to prevent and correct any harassing behavior and that Ms. Rodriguez

failed to avail herself of opportunities to bring that matter to Wet Ink's attention.[9]  *See*

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  To succeed on this defense, Wet

Ink must demonstrate by a preponderance of the evidence that it "exercised reasonable care to

prevent and correct promptly any sexually harassing behavior," and the plaintiff "unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer

or to avoid harm otherwise."

As to the first element, reasonable care and prompt response, the record does disclose

that Wet Ink maintains a sexual harassment policy that encourages employees to lodge

complaints of such conduct.  Ms. Rodriguez's evidence shows that she submitted a letter of

complaint in February 2006.  The letter made reference to "prejudice" and "discriminati[on]"

directed by Mr. Metlz towards Ms. Rodriguez, although Ms. Rodriguez did not expressly state

that she felt that the prejudice and discrimination she was referencing was based on her sex.

Nevertheless, the Court finds that the letter was sufficiently specific to put Wet Ink on notice that

---

[9]Wet Ink does not invoke other potential affirmative defenses, such as a contention that
the hostile environment here did not "culminate" in any tangible employment action.  *See e.g.*
*Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).  Accordingly, the Court does not consider
whether such a defense might be asserted here.

Ms. Rodriguez was complaining that Mr. Meltz was engaging in prohibited discrimination against her, such that Wet Ink had an obligation to promptly investigate and correct Mr. Meltz's behavior.  The record does not indicate that Wet Ink did anything in particular to remedy the situation, other than some vague reference to extracting from Mr. Meltz a promise to "get along better" with Ms. Rodriguez.  Obviously, these corrective efforts failed to bear fruit, as some of the more troubling conduct by Mr. Meltz – including the explicitly sex-discriminatory comments by him – occurred after Ms. Rodriguez's first complaint, and Ms. Rodriguez felt obligated to complaint about Mr. Meltz again in June 2006.  Under these circumstances, a reasonable jury could find that Wet Ink's response to Ms. Rodriguez's letter was cursory and failed to promptly correct the harassing behavior.

Therefore, Wet Ink is not entitled to judgment as a matter of law with respect to the hostile work environment claim based on its affirmative defense.

### D.      Retaliation

Wet Ink did not address any potential Title VII retaliation claim by Ms. Rodriguez. Although the Court does not endorse Ms. Rodriguez's decision to plead a single Title VII claim, despite seeking relief under a variety of discrete theories of Title VII liability, the Court cannot say that Wet Ink had no notice that Ms. Rodriguez intended to assert such a claim.[10] *See e.g. Docket # 1, ¶ 40.*

The Court will not attempt to address the sufficiency of a claim that the parties have not meaningfully addressed.  The Court has some reservations as to the sufficiency of the claim, but

---

[10]Indeed, the point headings in Wet Ink's motion specifically reference retaliation, although the body of the argument does not.

those matters can be taken up in a Rule 50 motion at trial if the evidence is indeed insufficient.

**IT IS THEREFORE ORDERED** that

(1)     Defendant Wet Ink, LLC d/b/a AlphaGraphics a/k/a Wet Ink, Corporation's Motion for Summary Judgment (**#70**) is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment in favor of Wet Ink is granted as to Ms. Rodriguez's claim of national origin/ancestry discrimination under any theory and to the extent her sex discrimination claim is based on any adverse action other than her immediate termination upon giving two-weeks' notice.   Her sex discrimination claim premised upon disparate treatment arising from her immediate termination and her hostile work environment claim based on sex will proceed to trial.

(2)     A final pretrial conference is scheduled for **June 14, 2012 at 1:30 pm** in Courtroom A901 before Judge Marcia S. Krieger.  All provisions of the Court's Trial Preparation Order shall apply to the rescheduled conference

Dated this 30th day of March, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge